7:20MJ61

## AFFIDAVIT IN SUPPORT OF APPLICATION FOR SEARCH AND SEIZURE WARRANT

I, Joshua E. Rogers, being duly sworn, declare and state the following:

### INTRODUCTION

1.  I am a Special Agent with the Drug Enforcement Administration (DEA), currently assigned to the Roanoke Resident Office Tactical Diversion Squad (TDS) in the Washington Field Division. As a duly appointed Special Agent in the DEA, I am charged with the duty of enforcing the Controlled Substances Act, and am authorized under Title 21, United States Code, Section 878 to carry firearms, execute warrants, make arrests for offenses against the United States of America, and to perform other law enforcement duties as authorized by law.

2.  During my employment with the DEA, I have successfully completed DEA Basic Agent Training that was held at Quantico, Virginia. I have participated in numerous drug investigations that have included physical and electronic surveillance, interception and analysis of wire and oral communications, execution of search and arrest warrants, evidence handling, undercover operations, control and administration of confidential sources, international drug importations, domestic drug distribution organizations, and the arrest and subsequent prosecution of numerous drug traffickers. I have also spoken on numerous occasions with informants, suspects, and experienced drug investigators concerning the manner and means that drug traffickers use to further the operations of their drug trafficking organizations and the most effective methods for investigating and dismantling drug trafficking organizations.

3.  Through these investigations, my training and experience, and conversations with other experienced drug investigators and law enforcement personnel, I have become familiar with the statutes and regulations that govern the handling (i.e. ordering, processing, manufacturing, distributing, prescribing, dispensing, administering, importing, and exporting) of controlled

1

substances.   Moreover, I am familiar with the *modus operandi* of DEA Registrants[1] who, independently or in concert with others, abuse their authority, in a manner that results in controlled substances being ultimately diverted from the legitimate closed system of distribution to the illicit market.   Often, such diversion occurs from an ostensibly legitimate business or businesses by complicit registrants and/or complicit employees of registered individuals or entities.   In cases involving medical clinics, I know that these diversion schemes often involve the use of telecommunications devices for oral and/or typed messaging between or among participants of the scheme, the movement of United States Currency by cash transactions and electronic transfers between accounts, and fraudulent aesthetics to present a façade of a legitimate business.   This affidavit is based upon my personal knowledge and participation in an ongoing drug and investigation and the personal knowledge and participation of other experienced law enforcement officers participating in this investigation.

4.   There is probable cause, based on information contained in this affidavit, to believe that Benjamin Cameron DAVIS, MD, a) dispenses or distributes, and conspires to dispense or distribute controlled substances—namely, oxycodone, hydrocodone, and hydromorphone, all of which are opiates and Schedule II controlled substances, in violation of Title 21, United States Code, Sections 846 and 841(a)(1), and b) acquires or obtains controlled substances by misrepresentation, fraud, or deception, in violation of Title 21, United States Code, Section 843(a)(3).

5.   Your Affiant believes, based on the information set forth herein, that a search of the following location, which is located in the Western District of Virginia, will lead to evidence,

---

[1] A DEA Registrant is an individual (physician, pharmacist, veterinarian, etc.,) who received a DEA Registration Number authorizing the prescribing and/or dispensing of Schedule II through V controlled substances.

fruits, and instrumentalities of the aforementioned crimes:

- DAVIS' primary residence, 119 23rd Street SE, Roanoke, Virginia

6. Not all of the facts of the investigation known to me are contained herein; rather, only those facts necessary to establish probable cause for the search of the above-listed location have been included.

## INVESTIGATION

### BACKGROUND

7. DAVIS was previously registered with the DEA as a Practitioner with the authority to handle (to include prescribe, order, and/or administer) controlled substances in Schedules 2, 2N, 3, 3N, 4, and 5 under DEA Registration Number FD0960903, originally issued July 22, 2008, with a registered address of Carilion Clinic, 1906 Belleview Avenue, Roanoke, Virginia. On May 21, 2020, DAVIS voluntarily surrendered his DEA Registration as a result of this investigation. The surrender was processed on May 22, 2020.

8. DAVIS is a licensed physician with a listed medical license expiration date of December 31, 2020. Open source database checks indicate that DAVIS operates as a wound care physician for Carilion Clinic at the following locations: 101 Elm Avenue, Roanoke, Virginia; 2900 Lamb Circle, Christiansburg, Virginia; and 1906 Belleview Avenue, Roanoke, Virginia.

9. Based on my experience, knowledge, and training, your Affiant knows that the diversion of controlled prescription drugs often involves a licensed physician, nurses, and office staff, who, for no legitimate medical purpose, prescribe, facilitate prescribing, or cause to be prescribed controlled substances to individuals. The physician and/or staff may engage in the manipulation of records, invoices, and prescriptions to conceal the illegal diversion of controlled substances and fraud. Nurses and/or office staff may further engage in activities to facilitate the illegal acquisition

3

of prescriptions for controlled substances.

10. As used in this affidavit and pursuant to Title 21, C.F.R., Section 1300.01, the term "prescription" is an order for medication dispensed to or for an ultimate user, but does not include an order for medication that is dispensed for immediate administration to the ultimate user. Title 21, C.F.R., Section 1306.04(a), provides as follows:

> A prescription for a controlled substance to be effective must be issued for a legitimate medical purpose by an individual practitioner acting in the usual course of his professional practice. The responsibility for the proper prescribing and dispensing of controlled substances is imposed primarily on the prescribing practitioner, but a corresponding responsibility rests with the pharmacist who fills the prescription. An order purporting to be a prescription issued not in the usual course of professional treatment or in legitimate and authorized research is not a prescription within the meaning and intent of section 309 of the Act (21 U.S.C. § 829) and the person knowingly filling such a purported prescription, as well as the person issuing it, shall be subject to the penalties provided for violations of the provisions of law relating to controlled substances.

11. In addition, an order purporting to be a prescription that was not issued in the usual course of professional treatment or in legitimate and authorized research is not a prescription within the meaning and intent of Section 309 of the Act (21 U.S.C. § 829). Any person knowingly filling such a purported prescription, as well as the person issuing it, shall be subject to the penalties provided for violations of the provisions of law relating to controlled substances.

12. As a result of your Affiant's training, knowledge, and experience, your Affiant knows that oxycodone is a commercially available pharmaceutical narcotic analgesic that is used to treat moderate to severe pain and is available only with a prescription written by a licensed medical practitioner acting in the usual course of his or her professional practice. A Schedule II controlled substance is one that has a high likelihood of causing severe psychological and physical dependence in users and has a high potential for abuse. Oxycodone is a Schedule II controlled substance under 21 C.F.R. § 1308.12(b)(1). The 2017 Nursing Drug Handbook, which is used by

4

nurses in their normal duties, states that oxycodone should only be prescribed by health care professionals knowledgeable in the use of potent opioids for the management of chronic pain.

13. As a result of your Affiant's training, knowledge, and experience, your Affiant knows that hydrocodone is a Schedule II controlled substance and is a semi-synthetic opioid. Hydrocodone is marketed under the brand names of Lorcet, Lortab, Vicodin, and Norco, and is a commercially available pharmaceutical narcotic analgesic that is used to treat moderate to severe pain and is available only with a prescription written by a licensed medical practitioner acting in the usual course of their professional practice. According to the 2017 Nursing Drug Handbook, which is used by nurses in their normal duties, hydrocodone is used to treat moderate to moderately severe pain. Hydrocodone is a Schedule II controlled substance under 21 C.F.R. § 1308.12(b)(1), as it is a drug that has a high likelihood of causing severe psychological and physical dependence in users and has a high potential for abuse.

14. As a result of your Affiant's training, knowledge, and experience, your Affiant knows that hydromorphone is a Schedule II controlled substance and is a semi-synthetic opioid derived from morphine. Hydromorphone is marketed under the brand names of Dilaudid and Exalgo and is a commercially available pharmaceutical narcotic analgesic that is used to treat moderate to severe pain and is available only with a prescription written by a licensed medical practitioner acting in the usual course of their professional practice. Hydromorphone, similar to other Schedule II opioids, has a high abuse and dependence potential and produces tolerance. Prior to the current popularity of hydrocodone and oxycodone among drug abusers, low dose (2 and 4mg) immediate release hydromorphone formulations were the leading opioid products for abuse and diversion.

## CASE INITIATION

15. In or around April 2020, a source of information (SOI) notified a Montgomery

5

County Deputy Sheriff that DAVIS had prescribed oxycodone to Patient A, and then come to Patient A's residence to "confiscate" the medication for disposal purposes.

16. On April 29, 2020, at approximately 11:30 AM, your Affiant, Task Force Officer (TFO) Clark Jackson, and Montgomery County Sherriff's Office (MCSO) Deputy Jason Riggs conducted an interview of the SOI.

17. The SOI is a physician who indicated he/she knew DAVIS from residency.

18. Patient A is the SOI's elderly parent, who is DAVIS' patient. Patient A had been referred to DAVIS due to wounds on his/her legs.

19. Patient A and the SOI live together at the same residence.

20. The SOI explained that on March 12, 2020, at approximately 11:30 AM, Patient A traveled to Carilion Clinic Wound Center located in the vicinity of 2900 Lamb Circle, Christiansburg, Virginia, for his/her initial appointment. According to the SOI, Patient A was prescribed 30 5mg oxycodone tablets, as well as a ketamine compound. Prior to being prescribed the opioids by DAVIS, Patient A was opioid naïve. The SOI stated that Patient A attempted to ingest ½ of a 5mg oxycodone tablet prescribed by DAVIS but had an adverse reaction. Patient A no longer wanted to take the medication. In addition, the SOI stated that Patient A applied the ketamine compound to his/her wounds and also had an adverse reaction to the compound. The SOI stated the ketamine compound came with limited instructions on how it should be applied.

21. Photographs provided by the SOI confirm that Patient A had a follow-up appointment with DAVIS scheduled for March 26, 2020, at 11:30 AM. However, due to concerns about COVID-19 exposure, Patient A cancelled that appointment.

22. The SOI advised that upon cancelling her appointment, Patient A was told by someone in

6

DAVIS' office that DAVIS would be willing to come to his/her residence for the follow-up appointment. DAVIS then called Patient A and advised that he needed to come to his/her residence in order to check his/her wounds, the recliner he/she was using to ensure it allowed for sufficient circulation and reduction of swelling, and the lymphatic pump.

23. On March 29, 2020, the SOI sent an electronic message to DAVIS through Patient A's MyChart Message Center, expressing concerns about DAVIS coming to their shared residence to treat Patient A. During this correspondence and a subsequent telephone call, the SOI offered to take photographs of Patient A's wounds, the recliner, and lymphatic pump to send to DAVIS. DAVIS did not respond to the electronic message. The SOI then called DAVIS' office and cellphone at 540-204-6899 and again expressed concerns about DAVIS visiting the residence he/she shared with Patient A due to COVID-19. The SOI suggested a telemedicine visit.

24. DAVIS then asked about the oxycodone he prescribed Patient A on March 12, 2020. The SOI told DAVIS that Patient A took approximately ½ of one of the prescribed oxycodone tablets, experienced an adverse reaction, and declined to take any additional oxycodone. Patient A had approximately twenty-nine (29) oxycodone tablets remaining. The SOI stated DAVIS advised he needed to "confiscate" the remaining oxycodone tablets for disposal purposes.

25. Notwithstanding the SOI's request that DAVIS not visit the residence he/she shares with Patient A, DAVIS arrived at the residence on March 31, 2020, at approximately 2:59 PM. A camera at the front door captured the following image of DAVIS standing outside of the residence:

7



26. Upon DAVIS' arrival at the residence, Patient A called the SOI, who advised Patient A to slightly open the front door and toss the pill bottle containing the remaining oxycodone onto the front porch. Patient A did so; DAVIS took the medication and left the residence.

27. DAVIS later contacted Patient A, who asked about the oxycodone tablets.  DAVIS stated he disposed of the oxycodone tablets properly.

PRIOR DEPARTMENT OF HEALTH PROFESSIONS INVESTIGATION

28. On May 1, 2020, your Affiant issued Administrative Subpoena KR-20-592234 to Commonwealth of Virginia Department of Health Professions (VADHP) regarding previous investigations relating to DAVIS.

29. On May 11, 2020, your Affiant received the requested documents from VADHP.  The information revealed that DAVIS previously suffered from an addiction to Ambien. According to the VADHP records, on October 14, 2011, DAVIS was transported to Roanoke Memorial Hospital Emergency Department exhibiting an altered mental status and seizure activity associated with withdrawal effects of previous long-term Ambien use.

30. Based upon a review of the Virginia Prescription Monitoring Program, it was determined that DAVIS was receiving Ambien from multiple providers, including the reporting party.

31. There was no disciplinary action related to this VADHP investigation.

DATA OBTAINED FROM THE VIRGINIA PRESCRIPTION MONITORING PROGRAM

32. During the course of this investigation, investigators obtained raw prescription data

from the Virginia Prescription Monitoring Program (PMP)[2] for controlled substances filled in Virginia between April 2019 to April 2020. This data indicates that approximately 1,249 controlled substance prescriptions were issued or authorized by DAVIS and filled in Virginia, totaling approximately 51,519 dosage units.

33. Between April of 2019 and April of 2020, DAVIS treated a total of 323 patients, with an average age of 59.

34. In total, from April of 2019 to April of 2020, DAVIS has prescribed/authorized 493 prescriptions for Schedule II medications resulting in the distribution of 18,873 dosage units. Specifically, DAVIS authorized 108 prescriptions for hydrocodone resulting in the distribution of 3,825 dosage units, 331 prescriptions for oxycodone resulting in the distribution of 13,898 dosage units, 34 prescriptions for fentanyl resulting in the distribution of 330 dosage units, 5 prescriptions for hydromorphone resulting in the distribution of 530 dosage units, and 5 prescriptions for morphine resulting in the distribution of 290 dosage units.

35. DAVIS authorized and/or issued a total of 190 prescriptions for Schedule II medications resulting in the distribution of 7,345 dosage units to patients approximately 60 years old to 85 years old.

36. Mary Ann Hamilton and James Hamilton are two individuals listed in DAVIS' PMP as having received Schedule II controlled substance prescriptions from DAVIS.

37. Through the course of this investigation, your Affiant has identified Mary Ann and James Hamilton as DAVIS' mother-in-law and father-in-law.[3]

---

[2] The Virginia Prescription Monitoring Program is a database maintained by the Virginia Department of Health Professions and logs raw prescription data for controlled substances filled in pharmacies in the Commonwealth of Virginia. The data is subject to verification.
[3] The Virginia Administrative Code provides that a practitioner shall not prescribe a controlled substance to a family member (other than a Schedule VI substance) unless the prescribing occurs

## ANALYSIS OF PMP DATA FOR MARY ANN HAMILTON AND JAMES HAMILTON

38. An analysis of raw prescription data obtained from the Virginia Prescription Monitoring Program revealed that from approximately July 2018 to March 2020, DAVIS has issued/authorized approximately 23 prescriptions for oxycodone to Mary Ann Hamilton, resulting in the distribution of 1,090 dosage units. In addition, from April 2019 to May 2020, DAVIS issued/authorized approximately 17 prescriptions for oxycodone to James Hamilton resulting in the distribution of 850 dosage units.

39. James Hamilton's PMP reveals he received oxycodone prescriptions from his oncologist, which were filled on May 25, 2018, August 2, 2018, and September 13, 2018. Beginning April of 2019, DAVIS took over James Hamilton's oxycodone prescriptions, while Mr. Hamilton continued to receive prescriptions for gabapentin from his oncologist during the same time period, as reflected in the PMP data.

40. Mary Ann Hamilton's PMP reveals DAVIS began writing oxycodone prescriptions for her in July 2018. During the same time period, Ms. Hamilton was receiving prescriptions from other physicians, as reflected in the PMP data.

## SURVEILLANCE CONDUCTED ON MAY 11, 2020

41. On May 11, 2020, your Affiant and Special Agent (SA) Charles Sanders conducted periodic surveillance of DAVIS at Carilion Roanoke Community Hospital and residence of DAVIS located in the vicinity 119 23rd Street SE, Roanoke, Virginia.

---

in an emergency situation or in isolated settings where there is no other qualified practitioner available to the patient, or it is for a single episode of an acute illness through one prescribed course of medication. When treating or prescribing for a family member, the practitioner shall maintain a patient record documenting compliance with the statutory criteria for a bona fide practitioner-patient relationship. 18 VAC 85-20-25.

42. At approximately 3:28 PM, SA Sanders observed a vehicle resembling DAVIS' parked adjacent to his residence.

43. At approximately 5:24 PM, your Affiant received a telephone call from CVS Pharmacist Jason Ohler located in the vicinity of 2001 Colonial Avenue, Roanoke, Virginia[4]. Mr. Ohler stated that at approximately 5:10 PM, Mary Ann Hamilton provided the pharmacy with a prescription for 50 5mg oxycodone tablets prescribed to James Hamilton by DAVIS. Your Affiant requested that Mr. Ohler not relinquish custody of the prescription until your Affiant arrived. Mr. Ohler concurred and advised your Affiant to speak with Pharmacist Tom Allen upon arrival.

44. At approximately 5:50 PM, your Affiant and SA Sanders entered the CVS and spoke with Mr. Allen. Mr. Allen provided your Affiant the prescription for Mr. Hamilton. Your Affiant photographed said prescription, which was written by DAVIS for James Hamilton on May 11, 2020, and provided for 50 5mg oxycodone tablets. Mr. Allen stated that Mary Ann Hamilton had presented the prescription and would return to retrieve the medication in approximately 10-15 minutes.

45. At approximately 6:02 PM, your Affiant observed Ms. Hamilton wearing a light blue colored shirt and dark pants exit CVS and enter a red Dodge SUV bearing Virginia license plate VV4803. The National Crime Information Center revealed Virginia license plate VV4803 is registered to a 2014 Dodge, registered owners James Walter Hamilton and Mary Ann Hamilton with a listed address of in Roanoke, Virginia.

46. At approximately 6:04 PM, your Affiant observed Mary Ann Hamilton depart the CVS.

---

[4] Based upon a review of raw data obtained from the Virginia Prescription Monitoring Program in regard to the prescribing of DAVIS to Mary Ann Hamilton and James Hamilton, your Affiant contacted the aforementioned CVS and requested that prior to filling any Schedule II prescriptions issued/authorized by DAVIS to Mary Ann Hamilton or James Hamilton that the pharmacist notify your Affiant.

At approximately 6:07 PM, your Affiant observed Mary Ann Hamilton arrive at the residence of DAVIS located in the vicinity of 119 23rd Street SE, Roanoke, Virginia, exit her vehicle and walk towards the rear of the residence. In addition, your Affiant confirmed the vehicle previously observed by SA Sanders was DAVIS' Dodge bearing Virginia license plate AES5730. The National Crime Information Center revealed Virginia license plate AES5730 is registered to a 2004 Dodge, registered owner Benjamin Cameron DAVIS, with a listed address of 119 23rd Street SE, Roanoke, Virginia.

47. Based on training and experience, as well as other facts revealed throughout the investigation as detailed below, your Affiant believes that Mary Ann Hamilton obtained oxycodone that was issued/authorized by DAVIS to James Hamilton for subsequent distribution to DAVIS.

SURVEILLANCE OF DAVIS ON MAY 21, 2020

48. On May 21, 2020, your Affiant, SA Sanders, TFO Lawrence Findley, David Clements, and Clark Jackson established surveillance at Carilion New River Valley Medical Center located in the vicinity of 2900 Lamb Circle, Christiansburg, Virginia.

49. At approximately 12:05 PM, your Affiant observed DAVIS enter the driver's side of his registered Dodge pick-up. Shortly thereafter, your Affiant observed DAVIS exit the parking lot and travel northbound on Interstate 81.

50. At approximately, 1:00 PM, TFO Clements observed DAVIS arrive at the residence of Patient B in New Castle, Virginia. Patient B was confirmed through PMP data to be DAVIS' patient.

51. At approximately 1:17 PM, TFO Clements observed DAVIS depart the residence of

Patient B and travel to a Food Country USA located in the vicinity of 302 Market Street, New

Castle, Virginia. Market Street Pharmacy is also located within that Food Country USA. After

observing DAVIS enter Food Country USA, TFO Findley contacted Market Street Pharmacist,

Mike Fisher, to inquire about the prescribing habits of DAVIS. TFO Findley asked Mr.

Fisher whether DAVIS had been in the pharmacy in the last thirty minutes, either filling a

prescription for himself, or for Patient B. Mr. Fisher stated, to his knowledge, DAVIS had not

been in the pharmacy in the past thirty minutes. TFO Findley told Mr. Fisher DAVIS had been

seen going into the grocery store where the pharmacy is located.

52. At the mention of Patient B, Mr. Fisher told TFO Findley that he had recently spoken

with Patient B (who is related to Mr. Fisher) about a previous visit DAVIS made to his/her

residence. Patient B told Mr. Fisher that DAVIS made a house call to his/her residence and

looked at her medication, opening the pill bottles as if he was counting them. Once DAVIS

left the residence, Patient B noticed some of his/her pills were missing. Mr. Fisher stated he told

Patient B that DAVIS should not have counted his/her pills. Mr. Fisher gave Patient B a lock box

to keep his/her medications secure.

53. At the request of TFO Findley, Mr. Fisher called Patient B and asked if DAVIS had

been at his/her residence recently. Patient B told Mr. Fisher that DAVIS had been there that day

making a house call, but he did not look at his/her medication because they were in the lock box.

Patient B stated, however, that DAVIS looked through his/her daughter's medication. Patient B

thought that was strange.

54. At approximately 1:25 PM, your Affiant observed DAVIS exit Food Country USA and

enter his Dodge. Shortly thereafter, your Affiant observed DAVIS depart the parking lot and

travel to Roanoke, Virginia.

14

55. At approximately 2:11 PM, your Affiant observed DAVIS arrive at the residence of Patient C in Roanoke, Virginia. Patient C was confirmed through PMP data to be DAVIS' patient. As detailed below, Patient C was subsequently interviewed on May 26, 2020.

56. At approximately 2:22 PM, your Affiant observed DAVIS depart the residence and stop to obtain food for hospital personnel.

57. At approximately 2:52 PM, your Affiant observed DAVIS arrive at Carilion Roanoke Community Hospital located in the vicinity of 101 Elm Avenue, Roanoke, Virginia.  Shortly thereafter, your Affiant and TFO Clements made contact with DAVIS and requested that he accompany your Affiant and TFO Clements to the Drug Enforcement Administration Office for a voluntary interview, to which DAVIS agreed.

INTERVIEW OF DAVIS ON MAY 21, 2020

58. On May 21, 2020, your Affiant and TFO Clements conducted an interview of DAVIS at the Drug Enforcement Administration Office located in Roanoke, Virginia. Your Affiant advised DAVIS that this interview was voluntary and that he was free to leave at any time.  The following information was stated in substance and is not verbatim, and is intended to be a summary.

59. Your Affiant asked DAVIS whether he currently had an opioid addiction.  DAVIS admitted to an oxycodone dependency. DAVIS stated that he initially began taking opioid medications for insomnia as well as a bicep injury that occurred while playing lacrosse.  Further, DAVIS admitted he previously had obtained Schedule II medications from his patients for personal ingestion; however, he denied having done so on the date of the interview. DAVIS claimed to have started obtaining opioid medications from patients in order to wean them to a lower quantity and dispose of the excess medication. DAVIS admitted he was not as diligent as he should have been

about noting in the patient files when he had retrieved a previously prescribed medication from a patient and/or disposed of it.

60. With respect to the Schedule II medications prescribed to Mary Ann Hamilton and James Hamilton, DAVIS admitted to prescribing medications to his in-laws and acknowledged that the prescribing was inappropriate. DAVIS further admitted the oxycodone he prescribed to Mary Ann Hamilton, which he said was for chronic back pain, was excessive.

61. Your Affiant asked DAVIS specifically about the prescription for 50 oxycodone issued/authorized by DAVIS to James Hamilton on May 11, 2020, which was filled by Mary Ann Hamilton. DAVIS advised that after Mary Ann Hamilton picked the prescription up from CVS, she delivered the medication to DAVIS for his personal ingestion. DAVIS stated that Mary Ann Hamilton provided him approximately 40 tablets and she kept the remaining 10.

62. Your Affiant asked DAVIS whether James Hamilton was aware that the Schedule II substances DAVIS prescribed to him were being diverted back to DAVIS for his personal ingestion. DAVIS said that James Hamilton was not aware of the prescribed medications. DAVIS further admitted that he began prescribing oxycodone to James Hamilton after Mr. Hamilton's oncologist discontinued that medication.

63. Your Affiant asked where DAVIS maintains patient files. DAVIS advised your Affiant that he maintains files through Carilion's electronic medical record provider EPIC, but also advised he keeps some files at his house. Specifically, with respect to Mary Ann and James Hamilton, DAVIS advised he kept a file for them both through EPIC and at his home. DAVIS stated he keeps files for people he treats outside of Carilion at his residence.

64. During the interview, DAVIS mentioned that he collects medications for use through a

16

non-profit, Roanoke Valley Medical Missions, for which DAVIS is listed as the President. DAVIS stated most medications were in a locked cabinet and do not include controlled substances.

65. Prior to concluding the interview, your Affiant asked if DAVIS currently had any Schedule II medication in his possession that had not been prescribed to him. DAVIS relinquished custody of 6 suspected 10mg oxycodone tablets, which were in DAVIS' vehicle. DAVIS advised your Affiant that he had obtained the 6 tablets from a patient earlier in the week. DAVIS stated he was trying to decrease the quantity of medication being taken by this patient.

INTERVIEW OF PATIENT C ON MAY 26, 2020

66. On May 26, 2020, your Affiant and TFO Clements conducted an interview of Patient C at his/her residence in Roanoke, Virginia. The following information was stated in substance and is not verbatim, and is intended to be a summary.

67. Patient C explained that DAVIS had been at his/her residence on May 21, 2020, and that DAVIS had asked to see the medication DAVIS had previously prescribed. Patient C explained that during prior office appointments and home visits, DAVIS had conducted pill counts on his/her prescriptions. Patient C stated that DAVIS often took a majority of his/her prescribed medications, such as oxycodone, and would give four to six pills of the oxycodone back to Patient C in a bottle to keep. On May 21, 2020, Patient C stated he/she had hidden his/her medication so that DAVIS could not take any.

68. DAVIS' visit to Patient C on May 21, 2020, was the third home visit he conducted. Patient C estimated that he/she started seeing DAVIS in approximately November 2019 due to a wound that had not healed properly. DAVIS asked Patient C to bring his/her prescription medication to follow-up appointments. Once, Patient C forgot to bring the medication to his/her appointment and DAVIS became angry that he/she had not brought the medication.

17

69. Patient C believes DAVIS has taken oxycodone and tramadol from him/her during prior appointments. Patient C related that he/she hid his/her medication in an attempt to limit DAVIS' ability to take it. Patient C explained that DAVIS often changed the dosage of his/her oxycodone medication and estimated that he/she had been prescribed oxycodone 5mg, 10mg, and 15mg. Patient C stated that an employee at the CVS near Plantation Road in Roanoke, Virginia, commented to Patient C that his/her physician (DAVIS) was trying to drug him/her. Patient C recalled the conversation taking place after Patient C submitted prescriptions for oxycodone and fentanyl for the pharmacy to fill. Patient C stated that he/she was afraid to use the fentanyl after the employee's comment.

70. Patient C explained that DAVIS had provided him/her with Wellbutrin for smoking cessation on a previous office visit. Patient C stated that DAVIS had taken the medication back during the May 21, 2020, home visit.

71. Patient C recalled seeing DAVIS place his/her medication in his briefcase and in his pocket during office visits.

72. Patient C stated that a nurse had informed him/her that DAVIS had become irritable and began to argue with other medical staff. Patient C stated he/she noticed DAVIS' demeanor changed after the first few visits to see him. Patient C explained that the change occurred around the same time as the conversation he/she had with the nurse.

73. Patient C stated that DAVIS was scheduled to return to his/her residence for a subsequent home visit within the next week, at which time he planned to lance Patient C's wound. Patient C said that DAVIS had previously performed the procedure in the office but had informed Patient C that he would bring the necessary equipment to her residence.

## COMPUTERS, ELECTRONIC STORAGE, AND FORENSIC ANALYSIS

74. As described above and in Attachment B, this application seeks permission to search for and seize certain records and evidence of the target offenses that might be found at DAVIS' residence, in whatever form they are found. One form in which the records might be found is data stored on a computer's hard drive or other storage media. Thus, the warrant applied for would authorize the seizure of electronic storage media or, potentially, the copying of electronically stored information, all under Rule 41(e)(2)(B).

75. *Probable cause.* I submit that if a computer or storage medium is found on the premises, there is probable cause to believe those records will be stored on that computer or storage medium, for at least the following reasons:

    a.  From information obtained through the interview of DAVIS conducted on May 21. 2020, it is clear that DAVIS maintains medical records at his residence; however it has not been determined if such records are maintained in a paper format or electronically.

    b.  Based on my knowledge, training, and experience, I know that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet. Electronic files downloaded to a storage medium can be stored for years at little or no cost. Even when files have been deleted, they can be recovered months or years later using forensic tools. This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

    c.  Therefore, deleted files, or remnants of deleted files, may reside in free space or

slack space—that is, in space on the storage medium that is not currently being used by an active file—for long periods of time before they are overwritten.  In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

d.  Wholly apart from user-generated files, computer storage media—in particular, computers' internal hard drives—contain electronic evidence of how a computer has been used, what it has been used for, and who has used it.  To give a few examples, this forensic evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files.  Computer users typically do not erase or delete this evidence, because special software is typically required for that task.  However, it is technically possible to delete this information.

e.  Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."  The browser often maintains a fixed amount of hard drive space devoted to these files, and the files are only overwritten as they are replaced with more recently viewed Internet pages or if a user takes steps to delete them. Electronic data may also be stored in cloud-based or web-hosted applications and software commonly used in the medical industry and otherwise, such as EPIC electronic medical record (EMR) software or Dropbox.

76. *Forensic evidence*.  As further described in Attachment B, this application seeks permission to locate not only computer files that might serve as direct evidence of the crimes described on the warrant, but also for forensic electronic evidence that establishes how computers were used, the purpose of their use, who used them, and when. There is probable cause to believe that this forensic electronic evidence will be on any storage medium at DAVIS' residence because:

20

a.      Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active. Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords. Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use. Computer file systems can record information about the dates files were created and the sequence in which they were created, although this information can later be falsified.

b.      As explained herein, information stored within a computer and other electronic storage media may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion. In my training and experience, information stored within a computer or storage media (e.g., registry information, communications, images and movies, transactional information, records of session times and durations, internet history, and anti-virus, spyware, and malware detection programs) can indicate who has used or controlled the computer or storage media. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. The existence or absence of anti-virus, spyware, and malware detection programs may indicate whether the computer was remotely accessed, thus inculpating or exculpating the computer owner.

21

Further, computer and storage media activity can indicate how and when the computer or storage media was accessed or used. For example, as described herein, computers typically contain information that log: computer user account session times and durations, computer activity associated with user accounts, electronic storage media that connected with the computer, and the IP addresses through which the computer accessed networks and the internet. Such information allows investigators to understand the chronological context of computer or electronic storage media access, use, and events relating to the crime under investigation. Additionally, some information stored within a computer or electronic storage media may provide crucial evidence relating to the physical location of other evidence and the suspect. For example, images stored on a computer may both show a particular location and have geolocation information incorporated into its file data. Such file data typically also contains information indicating when the file or image was created. The existence of such image files, along with external device connection logs, may also indicate the presence of additional electronic storage media (e.g., a digital camera or cellular phone with an incorporated camera). The geographic and timeline information described herein may either inculpate or exculpate the computer user. Last, information stored within a computer may provide relevant insight into the computer user's state of mind as it relates to the offense under investigation. For example, information within the computer may indicate the owner's motive and intent to commit a crime (e.g., internet searches indicating criminal planning), or consciousness of guilt (e.g., running a "wiping" program to destroy evidence on the computer or password protecting/encrypting such evidence in an effort to conceal it from law enforcement).

c.     A person with appropriate familiarity with how a computer works can, after examining this forensic evidence in its proper context, draw conclusions about how computers were used, the purpose of their use, who used them, and when.

d.     The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. While it is possible to specify in advance the records to be sought, computer evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e.     Further, in finding evidence of how a computer was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium. For example, the presence or absence of counter-forensic programs or anti-virus programs (and associated data) may be relevant to establishing the user's intent.

77. *Necessity of seizing or copying entire computers or storage media.* In most cases, a thorough search of a premises for information that might be stored on storage media often requires the seizure of the physical storage media and later off-site review consistent with the warrant. In lieu of removing storage media from the premises, it is sometimes possible to make an image copy of storage media. Generally speaking, imaging is the taking of a complete electronic picture of the computer's data, including all hidden sectors and deleted files. Either seizure or imaging is often necessary to ensure the accuracy and completeness of data recorded on the storage media,

and to prevent the loss of the data either from accidental or intentional destruction. This is true because of the following:

a.        The time required for an examination. As noted above, not all evidence takes the form of documents and files that can be easily viewed on site. Analyzing evidence of how a computer has been used, what it has been used for, and who has used it requires considerable time, and taking that much time on premises could be unreasonable. As explained above, because the warrant calls for forensic electronic evidence, it is exceedingly likely that it will be necessary to thoroughly examine storage media to obtain evidence. Storage media can store a large volume of information. Reviewing that information for things described in the warrant can take weeks or months, depending on the volume of data stored, and would be impractical and invasive to attempt on-site.

b.        Technical requirements. Computers can be configured in several different ways, featuring a variety of different operating systems, application software, and configurations. Therefore, searching them sometimes requires tools or knowledge that might not be present on the search site. The vast array of computer hardware and software available makes it difficult to know before a search what tools or knowledge will be required to analyze the system and its data on the Premises. However, taking the storage media off-site and reviewing it in a controlled environment will allow its examination with the proper tools and knowledge.

c.        Variety of forms of electronic media. Records sought under this warrant could be stored in a variety of storage media formats that may require off-site reviewing with specialized forensic tools.

78. *Nature of examination*. Based on the foregoing, and consistent with Rule 41(e)(2)(B), the

warrant I am applying for would permit seizing, imaging, or otherwise copying storage media that reasonably appear to contain some or all of the evidence described in the warrant, and would authorize a later review of the media or information consistent with the warrant. The later review may require techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of a hard drive to human inspection in order to determine whether it is evidence described by the warrant.

79. Because several people share the PREMISES as a residence, it is possible that the PREMISES will contain storage media that are predominantly used, and perhaps owned, by persons who are not suspected of a crime. If it is nonetheless determined that that it is possible that the things described in this warrant could be found on any of those computers or storage media, the warrant applied for would permit the seizure and review of those items as well.

### AUTHORIZATION SOUGHT

80. The facts related to the investigation contained in this affidavit are limited and for the sole purpose of setting forth information to establish the probable cause to believe that federal criminal violations of Title 21, United States Code, Section 841(a)(1), Title 21, United States Code, Section 846, and Title 21, United States Code 843(a)(3).

81. Based on the information contained in this affidavit, your Affiant believes that the search of the residence of DAVIS, including but not limited to curtilage, will glean evidence, fruits, and instrumentalities of the aforementioned crimes, as well as to the identification of individuals who are engaged in the commission of those crimes.

82. It is requested that the warrant, application, and accompanying affidavit be sealed until further order of the Court in order to better ensure the safety of agents and others participating in the investigation, except that copies of the warrant in full or redacted form may be maintained

by the United States Attorney's Office, and may be served by Special Agents and other investigators of the United States Drug Enforcement Administration, federally deputized state and local law enforcement officers, and other government and contract personnel acting under the supervision of such investigative or law enforcement officers, as necessary to effectuate the warrant.

WHEREFORE, based on the foregoing, your Affiant requests that the Court issue a warrant authorizing the search of DAVIS' residential property, located at 119 23rd Street SE, Roanoke, Virginia, within the Western District of Virginia, within 10 calendar days of the issuance of the requested warrant.

Joshua E. Rogers
Special Agent
Drug Enforcement Administration

Sworn to and subscribed before me this 29th day of May, 2020
Sworn and attested to telephonically.

Robert S. Ballou
Honorable Robert S. Ballou
United States Magistrate Judge
Western District of Virginia